UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 08-50145 |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION ON |
| | ) | DEFENDANT'S MOTION TO |
| ALLEXANDER KLYNSMA, | ) | SUPPRESS [DOCKET 42] |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

This matter is before the court pursuant to a superseding indictment

charging Defendant Allexander Klynsma with one count of distribution of child

pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2253, and one count of

possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and

2256(8)(A). [Docket 28]. Mr. Klynsma moves the court to suppress statements

made to law enforcement agents and evidence seized as a result of a search of

his residence on September 15, 2008, pursuant to a search warrant.

[Docket 42]. In support of his suppression motion, Mr. Klynsma argues that

the search warrant was invalid and, thus, all of the fruits of the search,

including his statement, should be suppressed. [Docket 44]. Mr. Klynsma also

argues that his statements were taken in violation of Miranda[1] and the Fifth

_____

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

1

Amendment to the United States Constitution.  Id.  Mr. Klynsma requests a

Franks[2] hearing to determine the validity of the search warrant.

The government resists Mr. Klynsma's motion to suppress and request

for a Franks hearing.  [Dockets 50 & 51].  Mr. Klynsma's motion to suppress

was referred to this magistrate judge for a report and recommendation to the

district court pursuant to 28 U.S.C. § 636(b)(1)(B).

## FACTS

An evidentiary hearing on Mr. Klynsma's motion was held on Thursday,

August 13, 2009.  Mr. Klynsma appeared in person and by his counsel,

Assistant Federal Public Defender Gary Colbath, Jr.  The government was

represented by Assistant United States Attorney Gregg Peterman.  Four

witnesses testified in person at the hearing:  Troy Boone, a special agent with

the South Dakota Division of Criminal Investigation (hereafter "DCI"); Lance

Barry, also a special agent with DCI; John Delgado, Mr. Klynsma's former

roommate; and Mr. Klynsma.  From the testimony and exhibits admitted at the

hearing, the court finds the following facts.

Agent Troy Boone has been employed as a DCI agent since July 1999.

Prior to that, he spent approximately eight years as a South Dakota Highway

Patrolman.  Since 2005, Agent Boone has specialized as a Computer Crimes

Specialist for the DCI.  In that capacity, he has received specialized training, as

evidenced by Exhibit 4, his curriculum vitae.  He has investigated

_____

[2]Franks v. Delaware, 438 U.S. 154 (1978).

approximately 20 state cases and 20 federal cases that have resulted in computer child pornography charges.

As part of Agent Boone's duties, he searches the Internet looking for persons who offer computer files containing child pornography for sharing. Typically, a person engaging in such conduct will use a peer-to-peer file sharing software. Using peer-to-peer software requires the user to make his own files available for sharing in order to access other persons' files to share. A person's files on his or her computer will only be available for "sharing" via the peer-to-peer software if the person's computer is turned on and he or she is logged onto the peer-to-peer software at the time.

Computer files offered on peer-to-peer software can be analyzed and identified by a mathematical algorithm known as a Secure Hash Algorithm Version 1 (hereinafter "SHA" value). A SHA value of a computer file is, so far as science can ascertain presently, unique. No two computer files with different content have ever had the same SHA value. From investigations of child pornography that have been conducted in the past, law enforcement maintains a database of the SHA values of computer files that have been discovered to contain known images of child pornography.

On September 4, 2008, Agent Boone accessed a peer-to-peer file sharing software and located an internet protocol ("IP") address in South Dakota via file sharing software known as "Lime Wire." An IP address is a computer's numeric address, by which it can be located and by which computers accessing

the Internet can be identified. Every IP address that is exposed to the public Internet is unique. If one knows the date and time an IP address was used, typically the company providing the Internet service can identify the account holder of the IP address by name and physical address.

The IP address in South Dakota accessed by Agent Boone was offering a list of over 500 files that it would share with others via the peer-to-peer network. Of the 500 files, 147 of them had SHA values that matched SHA values of known images of child pornography. However, when Agent Boone attempted to download some of these offered files from the South Dakota IP address, he was not able to do so.[3]

On September 5, 2008, Agent Boone provided the IP address he had connected with the night before to Midcontinent Communications, an Internet Service Provider associated with the IP address Agent Boone was investigating. Midcontinent informed Agent Boone, pursuant to a subpoena, that the IP address he was investigating was leased to John Delgado of 5123 Ethan Court, Rapid City, South Dakota. Upon further investigation, Agent Boone learned that Mr. Klynsma and Sheila Bonner[4] also lived at the same address with Mr. Delgado. Surveillance on September 5, 2008, of the Ethan Court residence

---

[3]Agent Boone testified that there were myriad reasons why he might not have been able to download from the South Dakota IP address he found. For example, others might have been downloading at the same time, the owner of the IP address may have turned off the file sharing function, or the owner of the IP address may himself have been downloading from other sites at the time.

[4]It is believed that Sheila Bonner is the wife of John Delgado.

revealed a motor vehicle parked at that address that was registered to Mr. Klynsma.

On September 14, 2008, Agent Boone again connected to the IP address at Ethan Court via the peer-to-peer file sharing software. This time, 43 of the files being offered by the Ethan Court IP address matched SHA values of known images of child pornography. This time, when Agent Boone attempted to download a file, he succeeded in downloading 93 percent of a file containing a video. Agent Boone watched the video file and observed that it contained images of approximately 10 juvenile males masturbating. The file was named with a vulgar name that appropriately suggested its content. See Docket 44, Exhibit 2, at page 6, ¶ 26.

Using the information gained in his investigation of the IP address at Ethan Court, as well as his knowledge and training in investigating child pornography, Agent Boone and Agent Aramayo put together an application for a search warrant and an affidavit in support of that application, which was signed only by Agent Aramayo. The search warrant described the following:

1. the training, education, and qualifications of Agents Aramayo and Boone in the area of investigating computer crimes;
2. the fact that computers are identified on the Internet through their IP address;
3. the fact that an Internet Service Provider can usually identify an account by name and physical location that uses a particular IP address if supplied with the date and time a particular IP address was used to access the Internet;
4. that persons who wish to locate and view child pornography often use computers and peer-to-peer software to do so;
5. that peer-to-peer file sharing software enables a particular user to access files offered by other users via the software and also makes the user's files available to others using the software;

6.     that computer files on peer-to-peer networks are assigned SHA values that are thought to be unique to each file;

7.     that no two different computer files have ever had the same SHA value;

8.     that a database exists that contains the SHA values of all computer files which law enforcement has discovered to contain known images of child pornography;

9.     that a "GUID" ("globally unique identifier") number is assigned to computers and files shared on a peer-to-peer network and that the GUID is unique to both the IP address and to the user account; and

10.     the facts relating specifically to the investigation of the Ethan Court IP address as discussed above.

The search warrant was issued by a United States Magistrate Judge on September 14, 2008.[5]

Agent Boone was not aware at any time prior to September 15, 2008, that a wireless device was being used at the Ethan Court address. On September 15, 2008, law enforcement agents, including Agent Boone and Agent Lance Barry[6], prepared to execute the search warrant on the Ethan Court address. Just prior to the meeting where officers were to be briefed about the search, Agent Boone used his computer to again access the IP address at Ethan Court and he was able to do so successfully via the peer-to-peer file sharing software.

Upon executing the search at the Ethan Court address, numerous computers were seized as it was discovered that Mr. Delgado operated a

---

[5]It was not, however, the undersigned.

[6]Lance Barry has been employed with the South Dakota DCI since January 2001. Prior to that he was a deputy sheriff in Union County, South Dakota from 1992 to 2001. He also served as a military policeman for four years while serving in the United States Marine Corps.

computer repair business out of the residence.  Also, upon execution of the search warrant, the officers discovered a wireless device was in use at the Ethan Court address and that numerous computers could have and in fact were using the same IP address via that wireless device.  The computers seized during the search included a laptop and a desktop computer, both owned by Mr. Klynsma.  Photographs taken by law enforcement at the time of the search show Mr. Klynsma's desktop computer was disassembled and not plugged together nor plugged into any power source at the time of the execution of the search warrant.  Mr. Klynsma's desktop computer did not have the capability to access the Internet wirelessly.  Furthermore, the room in which Mr. Klynsma's computer was found by law enforcement did not have a wire connection for the Internet.

Forensic analysis of all the seized computers was conducted some time later.  None of Mr. Delgado's computers, nor any of the computers being repaired by him, were found to have any child pornography on them.  The desktop computer, owned by Mr. Klynsma, was found to have the same video on it that Agent Boone had been able to download 93 percent of on September 14, 2008.  Furthermore, the "GUID" number on Mr. Klynsma's desktop computer matched the "GUID" number that Agent Boone had noted when he downloaded the pornographic video on September 14, 2008.  "GUID" stands for "Globally Unique Identifier" and it is a number that is unique to every computer, and unique to every user account on the computer.  A "user

account" is a log-in assigned to a particular account. If a computer is "cloned," Agent Boone testified that the "GUID" number might be the same on the second computer.

When Agents Boone and Barry arrived at the Ethan Court address, they did not partake in the actual search. Instead, they questioned John Delgado, who was at home at the time. Mr. Delgado denied any knowledge about computerized child pornographic images. He suggested that Mr. Klynsma was the only other person at the residence who could have been engaged in sharing child pornography via the Internet. The agents were informed that Mr. Klynsma was not at home, and was instead working at a Sears store at the Rushmore Mall in Rapid City, South Dakota.

Agents Boone and Barry left Ethan Court to make contact with Mr. Klynsma at Sears. The officers went to the automotive department and asked for Mr. Klynsma. When he appeared, they introduced themselves and asked Mr. Klynsma if he would talk to them. Nothing was said inside the Sears store about the topic of the conversation or the fact that a search was currently underway at Mr. Klynsma's home. Neither agent was in uniform and neither agent had a weapon on display.

Outside the Sears store, the parties decided to talk in Agent Boone's vehicle so as to afford Mr. Klynsma some privacy. The vehicle remained parked in a public parking lot outside Sears. Other vehicles came and went during the interview. Agent Barry sat in the driver's seat. Mr. Klynsma sat in the front

passenger seat. Agent Boone sat in the back seat. The vehicle was not a marked law enforcement vehicle. The doors to the vehicle remained unlocked at all times during the interview. Agent Barry ran the air conditioning during the interview, so the windows were closed.

Upon entering the vehicle, Agents Barry and Boone repeated their introductions. They told Mr. Klynsma that he was not under arrest. The agents also told Mr. Klynsma that he was free to leave the interview at any time, but they did not advise him that he did not have to talk to the agents. Agent Barry testified that he believed that statement that Mr. Klynsma could leave at any time implicitly also conveyed the idea that Mr. Klynsma was free to refuse to talk to the agents if he wanted to. When Mr. Klynsma testified, he agreed that a statement that one is free to leave at any time "probably" also means one is not obligated to talk.

Agent Barry initiated a tape recorder in the vehicle prior to entering it, intending to tape the entirety of the interview with Mr. Klynsma. However, the tape recorder did not function and the first half of the interview was not recorded. Neither agent informed Mr. Klynsma that the interview was being recorded.

After the introductions and advisement that he was not under arrest and could leave at any time, the agents told Mr. Klynsma that a search warrant was being executed at his house at that time and that they were looking for

evidence of child pornography in computer devices.  The agents told
Mr. Klynsma that that was the subject they wanted to discuss with him.

According to Agent Barry, Mr. Klynsma was calm and cooperative
throughout the interview, which lasted approximately one hour.  Mr. Klynsma
admitted to the officers that he had intentionally possessed child pornography.
Additionally, Mr. Klynsma told the officers he had sexually molested several
male foster children that his parents had brought into their home while Mr.
Klynsma was a minor, information that the officers had not suspected previous
to this interview.  Agent Barry described the overall tenor of the interview as
cordial.  He stated that at no time did either agent raise their voices, threaten,
swear, physically touch, or engage in any deception with Mr. Klynsma.

Again according to Agent Barry, Mr. Klynsma stepped outside the vehicle
several times during the hour long interview to smoke a cigarette.  Either Agent
Boone or Agent Barry stepped outside the vehicle at the same time.
Mr. Klynsma was never stopped from leaving the vehicle nor was his freedom of
movement restrained in any way either inside or outside the vehicle.  Agent
Barry testified that, during his earlier interview with John Delgado, Delgado
had told the agents that Mr. Klynsma was not welcome to come back to the
residence at Ethan Court.

Mr. Klynsma also testified at the hearing, and related slightly different
facts.  Mr. Klynsma stated that, at the inception of the interview when the
agents asked him if he would talk to them about child pornography,

Mr. Klynsma stated that he did not want to incriminate himself, a statement that Agent Barry denied had ever been made. According to Mr. Klynsma, Agent Barry yelled in response to this, "Answer the damn question," which Agent Barry also denied occurred. Mr. Klynsma agreed that the agents told him he could not go home, but he stated that his understanding of why he could not was because the search was being conducted. Mr. Klynsma denied leaving the vehicle "several times" to smoke a cigarette, but did admit to doing so once. He agreed that he was allowed to do so, but felt that the agent who also stepped out of the vehicle was doing so to ensure that Klynsma did not flee. Mr. Klynsma testified that it was his subjective impression from everything that happened and was said during the interview that he was not free to leave.

At one point when Mr. Klynsma stepped outside the vehicle to smoke, Agent Barry discovered that the tape recorder was not working. He then activated another machine and successfully taped the remainder of the interview. That recording was admitted as Exhibit 5 at the hearing. The recording evidences Mr. Klynsma and the agents talking in exceedingly calm and conversational tones. The three are even heard to laugh over something that was said at one point. On the recording, the agents again reminded Mr. Klynsma that he was not under arrest and was free to leave at any time.

Agent Barry and Mr. Klynsma both testified that Mr. Klynsma had become tearful at one point early in the interview. Mr. Klynsma agreed that his

distress was over the subject matter being discussed, not the tactics being employed by the agents.

At the end of the interview, the agents inquired whether Mr. Klynsma had any intention of hurting himself. As Agent Barry testified, it is not uncommon for persons accused of possessing child pornography to attempt suicide. Mr. Klynsma answered "no," he was not going to harm himself. They then asked if he was planning on hurting someone else. He answered that he was "not planning on it." When the agents inquired further, Mr. Klynsma indicated that if he became distraught while driving his car, he could unintentionally hurt someone. The agents then asked Mr. Klynsma about the possibility of checking himself into a mental hospital for treatment and counseling. Mr. Klynsma agreed to voluntarily do so.

The agents then explained that they would contact the Rapid City Police Department for courtesy transportation to a hospital. The agents reiterated that Mr. Klynsma was not being placed under arrest and would not be restrained. Mr. Klynsma expressed a desire not to have the police cruiser show up in front of his place of employment, and the agents assured him that they would make arrangements to meet the cruiser at some place removed from the Sears parking lot.

The agents asked Mr. Klynsma whether he himself wanted to tell his employer that he would not be returning to work that evening or whether Mr. Klynsma wanted the agents to relay that information. Mr. Klynsma asked

the agents to do so and, accordingly, Agent Boone relayed that information to the employer. Mr. Klynsma checked into a mental health hospital and stayed for two to three days, and then was discharged to go home. Mr. Klynsma never asked to leave the interview, except to smoke cigarettes.

John Delgado testified that he and Mr. Klynsma, along with Delgado's wife and child, shared the residence at Ethan Court which was the subject of the search warrant. Mr. Delgado testified that just a few days prior to the search, another roommate had moved out and Mr. Klynsma had moved into the newly-vacant bedroom of the exiting roommate.[7] Delgado testified that he had a wireless router for Internet in the house at Ethan Court and that the router was unsecured. Delgado testified that an unsecured wireless router enables anyone with a computer equipped with a wireless card to access the Internet via his wireless connection. Delgado also testified that the room into which Mr. Klynsma had moved a few days prior to the search was not wired for Internet service.

Mr. Delgado testified that he did not know if Mr. Klynsma ever hooked up his desktop computer and turned it on after moving into the new bedroom days before the search. He testified that Mr. Klynsma had built his desktop computer himself.

Mr. Klynsma never stated at any time during the interview that his computer at home was not running or even plugged in during the times Agent

---

[7]Mr. Klynsma also testified to this fact. He stated that he had been in the new bedroom at least three days prior to the search, and perhaps up to a week.

Boone had conducted his investigation. At the hearing, however, Mr. Klynsma testified that, after he had moved into the new bedroom at Ethan Court, he never assembled, hooked up, or plugged in his desktop computer at any time prior to the search on September 15, 2008. He testified that, when he went to work at Sears on September 15, his desktop computer (on which the offending images were found), was not operational because it was not hooked up and plugged in. He also testified that his desktop computer was not equipped with a wireless card and that the room in which the desktop was located was not wired for Internet service.

Mr. Klynsma now seeks to suppress the evidence obtained pursuant to the search warrant and the statements he made to Agents Boone and Barry on the day of the search. The government opposes the motion in all respects.

## DISCUSSION

### A.    The Search Warrant Did Not Lack Probable Cause

Mr. Klynsma alleges that the evidence seized from his residence pursuant to a search warrant should be suppressed. Mr. Klynsma argues that the search warrant was defective because Agent Aramayo omitted and mischaracterized material facts. Specifically, Mr. Klynsma alleges that Agent Charla Aramayo, in submitting her affidavit in support of the search warrant, deliberately and recklessly included false information and made material omissions of information necessary to the determination of probable cause.

The government asserts that the search warrant was valid in every respect. Furthermore, the government asserts that Mr. Klynsma has failed to make a sufficient preliminary showing under <u>Franks</u>, and therefore asserts that Mr. Klynsma's motion as to the search warrant should be denied.

### 1.     Preliminary Showing for a <u>Franks</u> Hearing

As a preliminary matter, a defendant is only entitled to a <u>Franks</u>[8] hearing if he makes a substantial showing that an affiant to a search warrant application knowingly or intentionally, or with reckless disregard for the truth, made false statements or omitted material facts and that the alleged statements were necessary to a finding of probable cause. <u>Franks</u>, 438 U.S. at 155-56. "Whether [the defendant] will prevail at that hearing is, of course, another issue." <u>Id.</u> at 172.

Here, the government concedes in its brief that Agent Aramayo was unaware of the presence of a wireless device in Mr. Klynsma's home and, thus, failed to tell the magistrate judge about that wireless device. Furthermore, the government concedes that Agent Aramayo did not tell the magistrate judge that a wireless device in a home potentially would allow other computer users from outside the home to access the Internet from that home's IP address. This concession, the court holds, is sufficient to show that a material fact was omitted from the affidavit in support of the search warrant sufficient to allow a <u>Franks</u> hearing to go forward.

_____

[8]<u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

## 2. Validity of the Search Warrant

### a. Probable Cause

The Fourth Amendment requires that a search warrant be issued only upon a showing of probable cause. United States v. Williams, 477 F.3d 554, 557 (8th Cir. 2007). Under Franks, in order to challenge a finding of probable cause, a defendant must show, by a preponderance of the evidence, that (1) the affiant, in preparing the search warrant affidavit, deliberately and knowingly, or with reckless disregard for the truth, included falsehoods; and (2) the affidavit lacks sufficient content to support a finding of probable cause if the challenged information is set aside. Franks, 438 U.S. at 171-72; United States v. Humphreys, 982 F.3d 254, 259 n.2 (8th Cir. 1992). The same analysis applies to omissions of facts in that the defendant must show (1) that the affiant intentionally or recklessly omitted material facts thereby making the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause. Humphreys, 982 F.3d at 259 n.2.

The defendant's challenge must be more than conclusory and must be supported by the evidence. Franks, 438 U.S. at 171. The defendant must specify which parts of the affidavit are claimed to be false and must provide a statement of supporting reasons or an "offer of proof." Id. "Allegations of negligence or innocent mistake are insufficient." Id. Finally, the defendant may only challenge the veracity of the affiant's statements and not that of

nongovernmental informants because a reviewing court is concerned only with whether the affiant knowingly and deliberately included falsehoods or recklessly omitted the truth.  Id.

A "reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists."  United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993) (citing Illinois v. Gates, 462 U.S. 213, 236 (1983)).  Further, affidavits supporting search warrants are considered presumptively valid.  Franks, 438 U.S. at 171.  "Probable cause requires that the circumstances set forth in an affidavit supporting an application for a search warrant demonstrate a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Tyler, 238 F.3d 1036, 1038 (8th Cir. 2001) (quoting Gates, 462 U.S. at 238)).  In determining whether probable cause exists, courts look to the totality of the circumstances and consider all the facts "for their cumulative meaning" rather than evaluating each fact independently.  Williams, 10 F.3d at 593; Tyler, 238 F.3d at 1038.  "Applications and affidavits for issuance of a warrant should be examined under a common sense approach and not in a hypertechnical fashion."  Williams, 10 F.3d at 593 (citing United States v. Ventresca, 380 U.S. 102, 109 (1965)).  The key question in determining whether a search warrant is supported by a finding of probable cause is whether, viewing all of the information collected by law enforcement as a whole, a "reasonable person

could suspect that a search would uncover evidence of crimes committed by [the defendant]." Tyler, 238 F.3d at 1038.

The Supreme Court summarized the probable cause standard as follows:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to insure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

Gates, 462 U.S. at 238-39 (citation omitted). In light of that framework, the court finds there was probable cause to issue the warrant as discussed more fully below.

### b. Whether Agent Aramayo Included Falsehoods

Mr. Klynsma argues that Agent Aramayo deliberately and recklessly included false information and omitted material information from the affidavit. An affidavit in support of a warrant must contain statements that are truthful. See Franks, 438 U.S. at 164-65. This, however, does not require that "every fact recited in the warrant affidavit is necessarily correct." Id. at 165. "[P]robable cause may be founded ... upon information within the affiant's own knowledge that sometimes must be garnered hastily." Id. Therefore, the affidavit must be " 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." Id.; see also United States v. Schmitz, 181 F.3d 981, 984, 986-87 (8th Cir. 1999) (holding that inaccuracies of an affiant's testimony regarding the details of an incident did

18

not undermine probable cause where the affiant reasonably concluded that she had observed a crime in progress). Courts are to consider not "simply whether a statement included in the affidavit was true; rather [they must consider] . . . whether, viewing all the evidence, the affiant must have entertained serious doubts about the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported." United States v. Neal, 528 F.3d 1069, 1072 (8th Cir. 2008) (quoting Schmitz, 181 F.3d at 986-87 (quotation omitted)) (brackets in original).

Mr. Klynsma argues that Agent Aramayo deliberately misrepresented the fact that Agent Boone accessed a computer at the IP address at Mr. Klynsma's residence on September 4 and 14, 2008. Mr. Klynsma argues that this statement, contained in Aramayo's affidavit, was false because Mr. Klynsma's desktop computer was turned off on September 14, so Agent Boone could not have accessed this computer on this date.[9]

Mr. Klynsma raises an interesting bit of evidence that, if believed, may serve to create reasonable doubt at trial. However, this court is not concerned with whether incriminating evidence was in fact found on Mr. Klynsma's computer or whether, in fact, Mr. Klynsma is guilty of the offenses with which

_____

[9]Although Mr. Klynsma argued in his brief that the evidence at the hearing would show that his computer was disassembled prior to September 4, the evidence did not conclusively show that. Instead, Mr. Klynsma's testimony, and that of Mr. Delgado, was that Mr. Klynsma's computer had been moved in its disassembled state between 3 days and a week prior to the search on September 15. Thus, the testimony would encompass the September 14 search conducted by Agent Boone, but does not stretch to cover a date 11 days prior to the search.

he is charged.  That is an inquiry into the circumstances that existed *after* the search was conducted.  This court's inquiry is prospective.  The inquiries this court must make are:  what information did the magistrate judge who issued the search warrant have at his disposal at the time the search warrant issued, and did the information available to the judge support his finding of probable cause.

No evidence was introduced at the hearing to suggest that either Agent Aramayo, Agent Boone, or the issuing magistrate knew that Mr. Klynsma's desktop computer was disassembled on September 4 or 14, 2008, so that it could not have been the computer that was being accessed by Agent Boone through Lime Wire.  Conversely, no evidence was introduced at the hearing to suggest that Agent Boone lied about accessing a computer, through Lime Wire, at the IP address at Mr. Klynsma's home that had images of child pornography on it.  Thus, the court rejects Mr. Klynsma's characterization as a falsehood the statement in Agent Aramayo's affidavit that Agent Boone did connect with a computer in the Klynsma home that had child pornography on it.

All that is required for the probable cause determination is sufficient facts to show that evidence of a crime will probably be found in the place to be searched.  <u>Gates</u>, 462 U.S. at 238-39.  Here, it is so far undisputed that Agent Boone did connect with a computer accessing the Internet via the IP address associated with the Klynsma residence, and that that computer had child pornography on it.  That is a crime.  It is reasonable to believe, given all

the facts contained in Agent Aramayo's affidavit, that the offending computer would still be found in the Klynsma home.  Thus, there was probable cause in support of the search warrant.  Agent Aramayo's statement about Agent Boone's connection with the offending computer is not rendered false merely by showing that the connection could not have been with Klynsma's desktop computer.  It remains for trial for the government to prove that it was a computer owned or controlled by Klynsma that contained the child pornography on it.

### c.    Whether Agent Aramayo Omitted Facts from the Affidavit

The court next turns to Mr. Klynsma's allegation that the omission of information about the possibility of remote access through a wireless network to the IP address registered to Mr. Klynsma's residence renders the search warrant invalid.  Specifically, the agents failed to alert the issuing magistrate to the fact, alleged by Mr. Klynsma, that his roommate utilized a wireless device which permitted persons outside the home to access the same IP address and download child pornography or store child pornography in the same IP address' file sharing program. [Docket 50].

There is no evidence that either Agent Aramayo or Agent Boone omitted the evidence in an attempt to mislead the magistrate judge.  Agent Aramayo's affidavit relies upon representations made to her by Agent Boone.  The testimony at the hearing by Agent Boone establishes that Agent Boone was not aware that there was a wireless device present in the Klynsma home at the

time Agent Boone conducted his investigation.  No evidence was introduced by either party to suggest that Agent Boone should have known about the wireless device prior to the application for the search warrant being made.  No evidence was introduced by either party to suggest what steps Agent Boone might have taken to ascertain whether there was such a wireless device.  Absent any knowledge about the wireless device, and any indicia that Agent Boone should have known, or was careless or reckless in not finding out about the wireless device, there is likewise no evidence in the record from which this court can conclude that Agents Boone and Aramayo should have informed the issuing magistrate about the potential capabilities of a wireless device.  The mere fact of an omission, standing alone, is insufficient to demonstrate intent or reckless disregard.  United States  v. Shorter, 328 F.3d 167, 171 (4th Cir. 2003) (affirming the district court's denial of relief after a Franks hearing where defendant failed to present any evidence, beyond the mere fact of omission, that the investigator's conduct was deliberate or reckless) (quoting United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990).  Likewise, the "failure to investigate fully [standing alone] is not evidence of an affiant's reckless disregard for the truth."  See United States v. Miller, 753 F.2d 1475, 1478 (9th Cir.1985); United States v. Mastroianni, 749 F.2d 900, 909-10 (1st Cir.1984); United States v. Young Buffalo, 591 F.2d 506, 510 (9th Cir.), cert. denied, 441 U.S. 950 (1979).  Probable cause "does not require an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming

corroborative evidence." <u>United States v. Davis</u>, 991 F.2d 819, 844 (D.C. Cir. 1993).

The court notes that the burden is on Mr. Klynsma to show that the agents recklessly or deliberately omitted material facts. <u>United States v. Gladney</u>, 48 F.3d 309, 313 (8th Cir. 1995). No such evidence was admitted at the hearing. Since the burden rests on Mr. Klynsma to make this showing, and he failed, the court finds that the failure of the agents to ascertain the existence of the wireless device and to inform the issuing magistrate about the capabilities of wireless devices was not a reckless or deliberate omission.

Under the totality of the circumstances set forth in the affidavit, there existed sufficient probable cause to believe that evidence of the commission of a crime would be found in Mr. Klynsma's residence. Mr. Klynsma acknowledges that a finding of probable cause is to be determined from the four corners of the affidavit [Docket 44], and only the information contained therein may be considered in determining the existence of probable cause. <u>See</u> <u>United States v. Stults</u>, ____ F.3d ____, Slip. Op. No. 08-3183 at 12, 2009 WL 2476695 (8th Cir. Aug. 14, 2009); <u>Gladney</u>, 48 F.3d at 312 (quoting <u>United States v. Leichtling</u>, 684 F.2d 553, 555 (8th Cir. 1982), <u>cert. denied</u>, 459 U.S. 1201 (1983). On its face, Agent Aramayo's affidavit was valid and provided ample probable cause for the issuing magistrate to conclude that evidence of child pornography would be found within Mr. Klynsma's residence.

Although not directly on point because no <u>Franks</u> allegations were made, this court finds instructive the recent Eighth Circuit opinion in <u>Stults</u>, <u>supra</u>. In that case, an agent had discovered that a computer at an IP address was engaging in peer-to-peer file sharing of child pornography on Lime Wire. <u>Stults</u>, Slip. Op. No. 08-3183 at 2-4. Stults argued that the agent's Lime Wire search over the Internet which identified his IP address failed to provide probable cause for the search warrant that subsequently issued. <u>Id.</u> at 11. The court reiterated the facts described in the affidavit in <u>Stults</u>:

> [T]he application and affidavit: (1) "described a method of communication known as peer-to-peer (P2P) computer file sharing using the worldwide Internet"; (2) "described how individuals wishing to share child pornography use the P2P method to share and trade digital files containing images of child pornography"; (3) "described Agent Morral's experience and training in computer usage and investigation of child pornography cases"; (4) "incorporated details of an investigation by [Agent Cecchini] . . . who accessed a P2P file designated Lime[W]ire" and "conducted a search looking for users accessing known child pornography sites; (5) stated that an IP address traced to Stults was identified as accessing child pornography sites; and (6) recounted that shared files from Stults's computer were downloaded and reviewed and were identified as containing "numerous images of child pornography."

<u>Id.</u> at 12 (quoting <u>United States v. Stults</u>, No. 8:07-CR-199, 2007 WL 3275129, at *2 (D. Neb. Nov. 2, 2007) (unpublished)). The court then held that these facts established probable cause for the issuance of the search warrant. <u>Id.</u>

The facts alleged in Agent Aramayo's affidavit and application for the search warrant in Mr. Klynsma's case are practically identical to the facts recounted in <u>Stults</u>. But for the stray fact that a wireless device was found in

Mr. Klynsma's home, the facts and legal conclusions in this case and the <u>Stults</u> case are identical. The court characterizes the fact regarding the wireless device to be a "stray" fact because it was never linked to the showing required under <u>Franks</u>. As noted above, there was no evidence from which the court could find or even infer that it was reckless or even negligent of Agents Boone and Aramayo to fail to ascertain the existence of the wireless device prior to applying for and obtaining the search warrant. The court therefore recommends that Mr. Klynsma's attacks upon the validity of the search warrant in his case be rejected.

**B.      Supression of Statements**

**1.   Fruit of the Poisonous Tree**

The exclusionary rule provides that evidence that is the fruit of a search that is violative of the Fourth Amendment must be barred from trial. <u>Wong Sun v. U.S.</u>, 371 U.S. 471, 485 (1963). Mr. Klynsma argues that the search of his home pursuant to the search warrant described above was illegal and, thus, that the statements taken from him contemporaneous with that search should be suppressed as the fruits of an unlawful search under the Fourth Amendment. However, the court has already concluded, as discussed above, that the search pursuant to the search warrant was lawful under the Fourth Amendment. Thus, Mr. Klynsma's statements will not be suppressed on the grounds that they were the fruit of an unlawful search.

## 2.     Lack of Miranda warnings

The government agrees that law enforcement officers' interactions with Mr. Klynsma on September 15, 2008 constituted interrogation.  Therefore, the key issue is whether Mr. Klynsma was in custody during his interrogation.

### a.     Case Law Defining Custodial Interrogation

As a preliminary matter, some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  See United States v. Charbonneau, 979 F. Supp. 1177 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden.  See United States v. Moore, 104 F.3d 377, 391 (D.C. Cir. 1997).  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  See, e.g., United States v. Morriss, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden on the government to prove that Mr. Schmidt was *not* in custody.

The holding in Miranda "is that an individual must be advised of the right to be free from compulsory self-incrimination,  and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990)

(citing Miranda, 384 U.S. at 444).  Miranda warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may choose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time."  Colorado v. Spring, 479 U.S. 564, 574 (1987).  A Miranda warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  It is clear that the agents' direct questioning of Mr. Klynsma fits the definition of interrogation.

A suspect is considered to be "in custody" either upon his formal arrest or "under any other circumstances where the suspect is deprived of his freedom of action in any significant way."  Griffin, 922 F.2d at 1347 (citing Berkemer v. McCarty, 468 U.S. 420, 429 (1984)).  Absent formal arrest, a suspect is deemed to be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 68, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347.  "Two discrete inquiries are essential to the [in custody]

determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112 (1995).

In determining whether a suspect reasonably believed himself to be in custody, the court examines the totality of the circumstances.  Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)). The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation.  See Flores-Sandoval, 474 F.3d at 1146-47 (citing Griffin, 922 F.2d at 1349).

The first three factors are "mitigating factors which, if present, mitigate against the existence of custody at the time of questioning." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). The last three factors are "aggravating factors which, if present, aggravate the existence of custody." Id. at 501. Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Flores-Sandoval, 474 F.3d at 1147. In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered. Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

Courts have given substantial weight to an interrogator's advising a suspect that no arrest is being made or will be made at the time of questioning, and that the suspect is free to decline to answer questions or to terminate the interrogation at any point the suspect so chooses. For example, in United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), the court emphasized that "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. Id. at 826. Griffin, 922 F.2d at 1349-50. The court also cautioned that the Griffin factors are by no means exhaustive and should not be applied "ritualistically." Czichray, 378 F.3d at 827. Nonetheless, the Griffin factors still appear in Eighth Circuit case

law after Czichray, and continue to be cited with approval for determining the custody issue.  See, e.g. United States v. Plumman, 409 F.3d 919, 923 (8th Cir. 2005).

The location of a confession is not determinative of the issue of whether a suspect is "in custody" for purposes of Miranda.  Carter, 884 F.2d at 371.  The Eighth Circuit has concluded that some interrogations that took place in the suspect's place of employment were custodial, and others were not.  Compare Carter, 884 F.2d at 370- 72; with United States v. Dockery, 736 F.2d 1232, 1233-34 (8th Cir. 1984) (en banc).  Similarly, some interrogations at police headquarters or stations are custodial, while others are not.  Compare United States v. LeBrun, 363 F.3d 715, 720-22 (8th Cir. 2004) (en banc); with Louisell v. Director of Iowa Dept. of Corrections, 178 F.3d 1019, 1023 (8th Cir. 1999). The court in United States v. Johnson, 64 F.3d 1120, 1125-26 (8th Cir. 1995), found that the defendants were not in custody even though two police officers questioned them in the back of a patrol vehicle.

Finally, whether a suspect was the focus of an investigation at the time the interrogation took place is of little significance unless that fact was communicated to the suspect and contributed to the suspect's reasonable conclusion of not being free to go.  Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370 (citing United States v. Jimenez, 602 F.2d 139, 145 (7th Cir. 1979)). "[T]he critical inquiry is not whether the interview took place in a coercive or police dominated environment, but whether the defendant's 'freedom to depart

was restricted in any way.'" <u>LeBrun</u>, 363 F.3d at 720 (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)).

In <u>LeBrun</u>, the Naval Criminal Investigative Service ("NCIS") Cold Case Homicide Unit reopened an investigation into the disappearance of Ensign Andrew Muns, a disbursing officer stationed on the U.S.S. Cacapon during the Vietnam War. <u>LeBrun</u>, 363 F.3d at 717. In 1968, while the naval vessel was moored, Ensign Muns disappeared from the disbursing office along with $8,600. <u>Id.</u> The Navy concluded that Muns had stolen the money and deserted. <u>Id.</u> Nearly thirty years later, in 1999, Ensign Muns' sister, believing in her brother's innocence, convinced the NCIS Cold Case Homicide Unit to reopen the investigation into her brother's disappearance. <u>Id.</u>

Knowing that Michael LeBrun served as the disbursing clerk on board the same naval vessel as Ensign Muns, NCIS agents conducted four interviews with LeBrun in the fall of 1999. <u>Id.</u> The interviewers administered <u>Miranda</u> warnings at the start of three of the interviews, and LeBrun voluntarily answered questions regarding Ensign Muns' disappearance. <u>Id.</u> at 717-18. LeBrun stated that, upon reflection of repressed memories, "he realized that he may have been involved in the death and disappearance of Ensign Muns." <u>Id.</u> at 718. NCIS agents did not have further contact with LeBrun until approximately ten months later when they decided to interview him again. <u>Id.</u>

On September 21, 2000, NCIS Special Agent Early and Corporal Hunter of the Missouri Highway Patrol arrived unexpectedly at LeBrun's place of

employment and requested that he accompany them to the Missouri Highway Patrol office to be interviewed.  <u>Id.</u>  The agents did not inform LeBrun as to the subject matter of the interview, and LeBrun agreed to the interview under the mistaken belief that the officers were investigating his employer.  <u>Id.</u>  On the way to the patrol station, LeBrun rode in the front seat of an unmarked patrol vehicle, which was unlocked, and he was not restrained in any way.  <u>Id.</u>

Upon arriving at the police station, the officers informed LeBrun that he was not under arrest and that he was free to terminate the interview and leave at any time.  <u>Id.</u> at 718.  At no point did the officers provide <u>Miranda</u> warnings to LeBrun, although LeBrun testified at the suppression hearing that he understood what his <u>Miranda</u> rights were and that, when the interview started, he did not believe that he was in custody.  <u>Id.</u>  The officers took LeBrun into a windowless interview room with walls covered with enlarged photographs of scenes from LeBruns' life.  <u>Id.</u>  During the interview, the officers used psychological ploys to "facilitate" a confession by, for example, telling LeBrun that he was the prime suspect in the victim's death, that police had significant evidence confirming that LeBrun was the killer, and a trial would exhaust his financial resources and ruin his family's reputation.  <u>Id.</u>  At no point, however, did the officers shout at or physically threaten LeBrun.  <u>Id.</u>

LeBrun confessed to the murder of Ensign Muns after being questioned for approximately half an hour, describing the sequence of the murder and the disposal of the body and also physically reenacting the attack.  <u>Id.</u> at 718-19.

LeBrun was arrested at a later date and charged with felony murder.  Id. at 719.  LeBrun moved to suppress his confession, arguing that it was taken in violation of Miranda and his due process rights.  Id.  The district court suppressed his confession, concluding that LeBrun was in custody and was entitled to receive Miranda warnings or, alternatively, that his confession was coerced.  Id.  The Eighth Circuit reversed the district court's ruling.  Id.

In reaching its decision, the Eighth Circuit specifically stated that the "purportedly coercive aspects of this particular interview are largely irrelevant to the custody determination."  Id. at 720-21.  The court also stated that the district court erred in giving great weight to the following facts:  LeBrun was interviewed in a small, windowless room; the officers used deceptive interview tactics; the interview was designed to produce incriminating statements; and the officers falsely "trumped up" evidence.  Id. at 721.  The court opined that "some degree of coercion is part and parcel of the interrogation process and that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart."  Id.  The court further stated that " 'a noncustodial situation is not converted to one in which Miranda applies simply because ... the questioning took place in a 'coercive environment.' "  Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

In looking at the totality of circumstances surrounding LeBrun's interview, the court relied on the following facts in reaching its conclusion that

LeBrun was not in custody for purposes of <u>Miranda</u>.  <u>Id.</u> at 722.  LeBrun was never physically restrained nor placed in handcuffs.  <u>Id.</u>  The officers informed LeBrun prior to the start of the interview that he was free to leave.  <u>Id.</u>  LeBrun testified that he understood that he was free to terminate the interview and leave at any time.  <u>Id.</u>  LeBrun had his cellular phone and called his wife from the interview room, mitigating the "incommunicado nature of [coercive] interrogations."  <u>Id.</u>  Upon conclusion of the interview, the officers did not arrest LeBrun, but rather transported him to his home.  <u>Id.</u>  Importantly, the court placed great weight on the fact that LeBrun's freedom of movement was not restricted in any way.  <u>Id.</u> at 723.  Finally, the court reasoned that LeBrun's age (mid-fifties), work experience (military veteran employed as a manager in a real estate office), education (college educated), legal training (completed one year of law school), and past experience with NCIS investigators (had been interviewed by NCIS investigators multiple times) all supported the conclusion that a reasonable person in LeBrun's place would not have felt that he was in custody.  <u>Id.</u> at 723-24.  The court concluded that <u>Miranda</u> warnings were not required prior to the start of the interview because LeBrun was not in custody.  <u>Id.</u>

The Eighth Circuit came to the same conclusion in <u>United States v. Dockery</u>, 736 F.2d 1232 (8th Cir. 1984).  Here, two FBI agents interviewed Dockery concerning allegations that she was involved in stealing funds from a bank in which she was employed.  <u>Id.</u> at 1233.  Dockery denied any

involvement in the theft. Id. Approximately a month later, the FBI agents told a bank official to summon Dockery for questioning to a small, vacant office in the bank building where she worked. Id. Upon her arrival, the agents told her that she did not have to answer questions, that she was not under arrest nor was she going to be arrested, and that she was free to leave at any time. Id. The agents did not provide Miranda warnings. Id. During the interview, which lasted sixteen minutes, the agents told Dockery that they believed she was involved in the theft and that they had her fingerprints, which was a deliberately misleading statement. Id. Dockery again denied her involvement. Id.

The interview terminated, but the agents asked Dockery to wait in the reception area outside the interview room. Id. at 1234. Shortly thereafter, Dockery requested to speak to the agents again. Id. The agents returned and repeated their warnings that she did not have to speak to them and that she was free to leave. Id. During this meeting, Dockery admitted her involvement in the thefts, and she signed a written statement to that effect. Id. Dockery later moved to suppress her statements, arguing that they were taken in violation of Miranda and that they were involuntary. Id. The district court denied her motion, and the Eighth Circuit affirmed. Id.

In examining the totality of the circumstances surrounding the interview, the court found the following facts persuasive. Dockery was never handcuffed, physically abused, physically restrained, or threatened during the two

interviews.  Id.  The agents' misrepresentations regarding her fingerprints had no effect on the custody question.  Id.  Although Dockery's employer directed her to meet with the FBI, people at work often have their freedom of action "meaningfully restricted" by their obligations to their employers.  Id.  Even though the agents asked Dockery to wait in the reception area after the first interview, Dockery herself initiated the second interview.  Id.  Finally, Dockery was advised, at the commencement of each interview, of her right to terminate the interview and leave at any time.  Id.  The court concluded that Dockery was not in custody during the interview, Miranda warnings were not required, and her confession was voluntary.  Id.

In contrast to Dockery, the Eighth Circuit in United States v. Carter found workplace questioning to be custodial.  Carter, 884 F.2d 368, 370-72 (8th Cir. 1989).  The factors considered by the court in reaching this conclusion were that the suspect was called into the bank president's office where he worked, he was isolated from others who might lend moral support, his freedom of movement was curtailed by two inspectors, he was seated between the two inspectors during questioning facing the president's desk, he was never told he was free to leave or free to refuse to answer questions, the officers employed a "good cop-bad cop" routine during questioning, he was confronted with damning evidence of his guilt, and he had never been questioned by law enforcement officials before.  Id. at 371-72.  Significantly, Carter offered to

leave the bank president's office at one point to retrieve something and was told by one of his interrogators, "no, just stay here." Id. at 372.

In United States v. Longbehn, 850 F.2d 450 (8th Cir. 1988), the Eighth Circuit suppressed statements made by the defendant to law enforcement on the basis that such statements were obtained in violation of Miranda. Longbehn, 850 F.2d at 453. The defendant was a state police officer under investigation for supplying privileged information to his uncle in exchange for gratuities. Id. at 451. Law enforcement had secured a search warrant authorizing the search of the defendant's residence. Id. at 451. The police located the defendant at his place of employment, specifically the police department firing range, and detained him until an investigator arrived who then transported him to his home to witness the execution of the search warrant. Id. At the firing range, the investigator instructed the defendant to remove his gun and gunbelt and place them in the trunk of the squad car. Id. The defendant was not allowed to drive his own vehicle to his house, but rather was instructed to ride in the squad car. Id. The investigator took the defendant to the police annex building, where the defendant was instructed to wait outside the deputy chief's office for approximately 30 minutes. The defendant was then transported to his residence where several federal agents were present to execute the search warrant. Id. The search lasted approximately 60-90 minutes, and the defendant was chaperoned by at least one agent during this entire period. Id.

37

Although the defendant was told that he would not be interviewed, three separate agents asked the defendant "probing and substantive" questions about the ongoing investigation without first providing <u>Miranda</u> warnings. <u>Id.</u> After the search was complete, the defendant was returned to police headquarters and was only allowed to leave after he surrendered his police badge and identification. <u>Id.</u> Between two and-a-half to four hours had elapsed from the time that the defendant was detained at the firing range to the time he was allowed to leave. <u>Id.</u>

In looking at the totality of the circumstances surrounding the questioning of the defendant, the court determined that defendant's "freedom of action was curtailed to a degree associated with formal arrest." <u>Id.</u> at 452. The court considered the actions of law enforcement prior to, during, and after the interrogation, finding particularly persuasive the following facts: the defendant was detained at his place of employment beyond his usual work hours; the defendant was compelled to accompany law enforcement on what would otherwise be his own time; law enforcement instructed the defendant to remove his privately-owned gun and gunbelt and secure them in the trunk of a police vehicle; law enforcement precluded the defendant from using his own vehicle for transportation; the defendant as transported under police supervision to police headquarters and then to his home; the defendant was "continuously chaperoned" while at his home; the defendant was overtly interrogated by three separate law enforcement agents; the defendant was

transported back to police headquarters upon conclusion of the search; and the defendant was allowed to leave only after turning in his badge and gun. Id. at 452-53. The court concluded that, under these circumstances, law enforcement should have advised the defendant of his Miranda rights and secured a valid waiver prior to questioning. Id. at 453.

In United States v. Johnson, 64 F.3d 1120 (8th Cir. 1995), where two defendants questioned in the back of a police patrol vehicle were found not to have been in custody, the court relied for its conclusion on the following specific factors: the defendants were specifically advised that they were not under arrest; the defendants were not handcuffed or otherwise restrained while in the squad car; the defendants were not isolated; the defendants' passengers remained at the scene; although the defendants did not initiate contact with law enforcement, they responded to questions; the officers did not employ strong-arm tactics; the questioning was straightforward; the officers were not in uniform; only two officers questioned the defendants even though a number of officers were at the scene; and, finally, the defendants were not formally arrested or booked at the scene. Johnson, 64 F.3d at 1126.

### b.     Application of the Law to Mr. Klynsma's Interview

As stated earlier, two discrete inquiries are essential to determining whether a defendant was in custody during interrogation so as to require the advisement of Miranda rights. Thompson, 516 U.S. at 112. First, a court must examine the circumstances surrounding the interrogation. Id. Secondly, the

39

court must determine whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave" in light of the totality of the circumstances.  Id.

### i. Circumstances of the Interview

The court finds the following circumstances surrounding Mr. Klynsma's interview relevant to the custody inquiry.  On September 15, 2008, approximately 30-40 minutes after they arrived at Mr. Klynsma's residence to execute the search warrant, Agents Boone and Barry arrived at the Rapid City Sears store, where Mr. Klynsma worked, in order to interview him.  The agents interviewed Mr. Klynsma in the parking lot of the Sears store, in a public, readily-viewable location just steps away from Mr. Klynsma's place of employment.  The agents twice informed Mr. Klynsma he was free to leave, both at the initiation of the questioning and approximately halfway through it.  He was explicitly told he was not under arrest.  He was at no time restrained or instructed that he was not to move about freely, as evidenced by his freedom to exit the agents' vehicle to smoke a cigarette.

He voluntarily participated in the interview and never requested permission to leave.  He accepted a ride from the agents following the interview.  The agents employed no coercive or deceptive tactics, and they did not display their weapons.  Rather, they simply informed Mr. Klynsma they were investigating child pornography, and Mr. Klynsma confessed.  Following the interview, Mr. Klynsma was not placed under arrest, but was taken to a

hospital for mental health care.  Moreover, Mr. Klynsma was not arrested at the conclusion of the interview, a factor which weighs heavily against custody. See United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002).  In light of the totality of the circumstances surrounding the interrogation, a reasonable person in Mr. Klynsma's position would not have believed that his freedom of action had been curtailed to a "degree associated with formal arrest." See Berkemer v. McCarty, 468 U.S. 420, 429 (1984). The court concludes that Mr. Klynsma was not in custody during the questioning by Agents Boone and Barry on September 15, 2008, and thus, the officers were not required to advise Mr. Klynsma of his Miranda rights nor secure his waiver prior to questioning.  Accordingly, the motion to suppress on these grounds is denied.

### ii.    Reasonable Person Standard

In determining whether a suspect reasonably believed himself to be in custody, the test is one of objective reasonableness judged from the point of view of the suspect, not from the perspective of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  The court considers all of the facts and circumstances surrounding the interview in determining whether a reasonable person in Mr. Klynsma's position would have felt free to terminate the interview.  The court finds that, under an objective test and upon consideration of the six factors articulated in Griffin, a reasonable person would have felt free

to refuse to answer the agents' questions and terminate the interview. <u>See</u>
<u>Griffin</u>, 922 F.2d at 1349.

The Eighth Circuit has instructed that "[t]he most obvious and effective
means of demonstrating that a suspect has not been taken into custody . . . is
for the police to inform the suspect that an arrest is not being made and that
the suspect may terminate the interview at will." <u>Czichray</u>, 378 F.3d at 826.
Here, the agents told Mr. Klynsma he was not being arrested and was told his
participation was strictly voluntary. These facts favor a finding that
Mr. Klynsma could not reasonably have believed he was in custody.
Considered together, with the totality of the circumstances, the court
concludes that Mr. Klynsma was not in custody, and that <u>Miranda</u> warnings
were not required.

Mr. Klynsma understood the purpose of the questioning was to discuss
the agents' investigation of child pornography, and Mr. Klynsma knew other
agents were simultaneously searching his residence for evidence regarding the
same. Mr. Klynsma's own actions and statements belie his assertion that he
did not feel free to leave the scene of the interview when in fact he exited the
vehicle of his own accord at least once, then continued with the interview. The
court reaches this conclusion notwithstanding Mr. Klynsma's testimony at the
hearing that he held a subjective belief that he was not free to go. The test is
one of objective reasonableness, not a subjective test dependent on the
suspect's own view of the circumstances. The court concludes that a

reasonable person in Mr. Klynsma's position would have believed the agents when they told him he was not under arrest and could leave at any time.

### 3. Voluntariness

In addition to his <u>Miranda</u> argument, Mr. Klynsma also seeks to suppress his statement on the grounds that it was coerced and not a voluntary statement under the Fifth Amendment. The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." <u>Miller v. Fenton</u>, 474 U.S. 104, 109 (1985). "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." <u>United States v. Pierce</u>, 152 F.3d 808, 812 (8th Cir. 1998). The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." <u>Id.</u> The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence. <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004).

### a.    Colorado v. Connelly

The landmark Supreme Court case regarding voluntary confessions is

Colorado v. Connelly, 479 U.S. 157 (1986).  In Connelly, defendant Francis

Barry Connelly approached a police officer and, without any prompting, stated

that he wanted to confess to a murder.  Id. at 160.  The officer immediately

advised Connelly of his Miranda rights and inquired if he had been drinking or

taking any drugs.  Id.  Connelly denied taking any mind-altering substances

but stated that he had been a patient in several mental hospitals.  Id.

Connelly then spoke to a homicide detective, who again advised him of

his Miranda rights, and Connelly confirmed that he understood those rights.

Id.  Connelly confessed to murdering a young girl approximately nine months

earlier and provided the location where the murder took place.  Id.  Police

records revealed that the body of an unidentified female had been discovered

four months earlier in the location identified by Connelly.  Id.  At no time did

the homicide detective who took Connelly's confession observe any sign that he

was suffering from any kind of mental illness.  Id. at 161.

The next day, Connelly became visibly disorientated and was sent to a

state hospital for evaluation, where a psychiatrist diagnosed him with chronic

schizophrenia manifested through "command hallucinations" that interfered

with his ability to make free and rational choices.  Id. at 161.  Connelly stated

that the "voice of God" instructed him either to confess to the murder or to

commit suicide.  Id.  The psychiatrist confirmed that, although Connelly's

psychosis did not impair his cognitive abilities, that is, he was able to intellectually understand his <u>Miranda</u> rights, his psychosis did motivate his confession.  <u>Id.</u>

Based on this evaluation, the Colorado trial court found that Connelly's statements were involuntary and should be suppressed even though police had not coerced the confession or otherwise overreached.  <u>Id.</u> at 162.  The Colorado trial court held that Connelly's mental illness both impaired his free will by compelling him to confess and vitiated his attempted <u>Miranda</u> waiver.  <u>Id.</u>  The Colorado Supreme Court affirmed, finding that Connelly's severe mental illness overbore his rational judgment and free will, making his confession involuntary and negating his ability to waive his rights.  <u>Id.</u>  The court determined that the absence of police coercion did not foreclose a finding that Connelly's statement was involuntary.  <u>Id.</u>

The United State Supreme Court reversed, finding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[10]  <u>Id.</u> at 167.  The Court based its decision, in part, on the fact that cases considered by the Court over the 50 years preceding <u>Connelly</u> involving the constitutional privilege against compulsory self-incrimination had

---

[10]"Although <u>Connelly</u> arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case arises under the Due Process Clause of the Fifth Amendment, the analysis in the <u>Connelly</u> decision has been extended to apply to involuntary confession claims arising under the Fifth Amendment as well."  <u>United States v. Bad Hand</u>, 926 F.Supp. 892, 899 (D.S.D. 1996).

all "focused upon the crucial element of police overreaching." Id. at 163, 163 n.1 (citing Mincey v. Arizona, 437 U.S. 385, 387, 396-402 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 390 U.S. 519, 519-21 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); Beecher v. Alabama, 389 U.S. 35, 36-38 (1967) (police officers held gun to the head of wounded confessant to extract confessions); Davis v. North Carolina, 384 U.S. 737, 739-53 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); Reck v. Pate, 367 U.S. 433, 436-44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); Culombe v. Connecticut, 367 U.S. 568, 569-70, 621-22 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); Payne v. Arkansas, 356 U.S. 560, 561-68 (1958) (defendant held incommunicado for three days with little food; confession obtained when police officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); Ashcraft v. Tennessee, 322 U.S. 143, 153-55 (1944) (defendant questioned by relays of officers for 36 hours without an opportunity for sleep)).

The Court explained that the Due Process Clause prohibits involuntary confessions, and the Court has always required, as part of the *prima facie* case for a due process violation, that there be some sort of *state action.* Connelly, 479 U.S. at 165. Thus, with respect to claims of involuntary statements, the

Court concluded that this due process precedent requires that the necessary element of state action, here police coercion or overreaching, be established. Id.

In addition, the Court noted that the purpose of excluding involuntary statements taken in violation of the Due Process Clause is to deter police from violating other persons' constitutional rights in the future.  Id. at 166.  By applying the exclusionary rule in Connelly's case, where there had been no police wrongdoing, the Court concluded that the purpose of the exclusionary rule would not be furthered.  Id.  The Court noted that rules of evidence, not the Constitution, exist to ferret out false or untrustworthy evidence.  Id. at 167. The Due Process Clause seeks to prevent "fundamental unfairness" in the use of a statement, whether that statement is true or false or otherwise unreliable. Id. (citing Lisenba v. California, 314 U.S. 219, 236 (1941)).

**b.    Other Cases**

The Supreme Court in Connelly made it clear that its previous decisions in Blackburn v. Alabama, 361 U.S. 199 (1960), and Townsend v. Sain, 372 U.S. 293 (1963) were still good law.  Connelly, 479 U.S. at 164-65.  In Blackburn, a defendant's statement was held to be involuntary where the police learned that the defendant had a history of mental illness and was "probably insane" at the time of his confession.  Blackburn, 361 U.S. at 207-08.  Police exploited this weakness by holding the defendant incommunicado for 8 to 9 hours of sustained interrogation in a small room that, on occasion,

was literally filled with police.  Id.  It was these coercive tactics, and not the

defendant's mental condition alone, that led to the Court's conclusion that

police elicited the defendant's confession against his will.  Id. at 206-07.

Similarly, in Townsend, police administered a truth serum to the defendant

and then proceeded to elicit a confession.  Townsend, 372 U.S. at 298-99.  The

Connelly Court stated that both Blackburn and Townsend supported the

holding that the "mere examination of the confessant's state of mind can never

conclude the due process inquiry."  Connelly, 479 U.S. at 165.

Approximately six weeks after issuing its decision in Connelly, the

Supreme Court issued another important decision, Colorado v. Spring, 479

U.S. 564 (1987), further explaining what it meant by police coercion.  In

Spring, the police informed the defendant that they wanted to interrogate him

about some firearms offenses.  Id. at 566-67.  The police advised Spring of his

Miranda rights, which Spring waived.  Id.  During the course of the

interrogation, the police questioned Spring about his involvement in a murder.

Id. at 567.  Spring later argued that his waiver of his Miranda rights was

"compelled" because he was not told at the inception that he would be

questioned about the murder.  Id. at 573.  The Court rejected this argument,

stating that, "[h]is allegation that the police failed to supply him with certain

information does not relate to any of the traditional indicia of coercion:  'the

duration and conditions of detention . . ., the manifest attitude of the police

toward him, his physical and mental state, the diverse pressures which sap or

sustain his powers of resistance or self-control.' " Id. at 574 (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).  The Court indicated that the physical and mental state of the defendant is relevant to the inquiry as to what constitutes coercion.  Id.

The Eighth Circuit came to the same conclusion in United States v. Makes Room For Them, 49 F.3d 410 (8th Cir. 1995), in which the defendant argued that both his confession and Miranda waiver were involuntary due to his lower-than-average intelligence.  Id. at 415.  The defendant argued that his limited intellectual abilities made him more susceptible to having his will overborne.  Id.  The court rejected this argument, finding that, "[a]lthough age, education, and experience are factors in the voluntariness analysis, they are not dispositive."  Id.  The court further stated:

> We may assume for the sake of argument that Makes Room had a somewhat diminished capacity to resist pressure to waive his rights and confess.  However, this is one of two factors; we must also consider the conduct of the police.  We simply do not find the requisite coercive activity here.

Id. (internal citations omitted).

In United States v. Astello, 241 F.3d 965 (8th Cir. 2001), the Eighth Circuit concluded that coercive police tactics did not render the defendant's statements involuntary.  Id. at 968.  During the three-hour interrogation of the 18 year-old defendant, the two law enforcement agents conducting the interrogation used the following tactics:  (1) informing the defendant that the penalty for kidnapping resulting in death was life in prison with no chance of

parole; (2) informing the defendant that he could be charged in state or federal court for the same crime; (3) refusing to allow the defendant to speak to his mother despite repeated requests to do so; (4) placing time restraints on the defendant's decision to talk to them by stating that the "train" was leaving and those who told the truth would be on the train while those left behind would be charged with the crime; (5) implying (but never explicitly promising) that the defendant would receive a lesser sentence if he told the truth; and (6) telling the defendant that he had disgraced and dishonored his family by lying and had broken his father's heart. Id. at 967-68.

The court explicitly stated that it did not condone any of these tactics, but determined that they "were 'not so coercive as to deprive [the defendant] of [his] ability to make an unconstrained decision to confess.'" Id. at 967, 968 (quoting United States v. Mendoza, 85 F.3d 1347, 1351 (8th Cir. 1996)). The court examined the defendant's personal characteristics and mental state, concluding that there was no evidence that he possessed a delicate or fragile sensibility that would buckle under the weight of police interrogation. Id. at 968. The defendant was 18 years old, had completed the eleventh grade, and had prior dealings with the criminal justice system. Id.; see also United States v. LeBrun, 363 F.3d 715, 726 (8th Cir. 2004) (rehearing en banc) ("Generally, [the court] ha[s] concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled.") (citing United States v. Gallardo-Marquez, 253 F.3d 1121, 1123-24 (8th Cir. 2001)

(concluding confession was voluntary where defendant was of average intelligence and had prior contact with law enforcement); <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1134 (8th Cir. 2001) (concluding that confession was voluntary where defendant had full scale I.Q. of 88); <u>cf.</u> <u>Wilson v. Lawrence County</u>, 260 F.3d 946, 949 n.4 (8th Cir. 2001) (finding involuntary confession where defendant was mentally retarded, his overall mental abilities were in the bottom two percent of the population, and testimony revealed that he could be "talked into anything")).

The court also noted that the defendant had been advised of his <u>Miranda</u> rights prior to the interrogation and understood his rights. <u>Astello</u>, 241 F.3d at 966. The defendant understand the risks of confessing, that is, that he would be prosecuted for the crime. <u>Id.</u> at 968. He appeared unaffected by law enforcement's references to "family dishonor." <u>Id.</u> The court also found that the agents' promises of leniency did not render the defendant's confession involuntary. <u>Id.</u> (citing <u>United States v. Kilgore</u>, 58 F.3d 350, 353 (8th Cir. 1995) (court held that the defendant's confession was voluntary even if he "was confused and confessed to the crime on the mistaken belief that he had been promised leniency (or even if he had been promised some form of leniency)"); <u>see also</u> <u>Sumpter v. Nix</u>, 863 F.3d 563, 565 (8th Cir. 1988) (court held that defendant's confession was voluntary even though he alleged that his interrogators made implied promises of leniency). Further, the defendant was questioned for less than three hours and was not mistreated in anyway.

The court opined that "[p]olice interrogation tactics are designed to elicit a response, and the fact that the tactics produced the intended result here does not make [the defendant's] confession involuntary." <u>Astello</u>, 241 F.3d at 368. "'[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" <u>Id.</u> at 967 (quoting <u>Jenner v. Smith</u>, 982 F.2d 329, 334 (8th Cir. 1993)). The court found no evidence that the defendant's "will was overborne and his capacity for self-determination critically impaired," even in light of the coercive tactics employed by the agents. <u>Id.</u> at 968. The court concluded that the defendant's statements were voluntary. <u>Id.</u>

In <u>United States v. Santos-Garcia</u>, 313 F.3d 1073 (8th Cir. 2002), the Eighth Circuit held that a state trooper's comment that the defendant's children would be driving by the time he was released from prison did not render his confession involuntary. <u>Id.</u> at 1079. The court found that this comment "was not so coercive as to deprive [the defendant] of [his] ability to make an unconstrained decision to confess." <u>Id.</u> (additional citation omitted). In reaching this conclusion, the court found persuasive the fact that the interview lasted only 20 minutes and the trooper had administered <u>Miranda</u> warnings. <u>Id.</u> The court interpreted the trooper's comment as "merely an 'accurate representation[] of [the defendant's] predicament.' " <u>Id.</u> (quoting <u>United States v. Gallardo-Marquez</u>, 253 F.3d 1121, 1123 (8th Cir. 2001))

(statement that defendant could receive life sentence not unduly coercive)).

The court further stated that "telling [the] defendant in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his cooperation] with the government." <u>Santos-Garcia</u>, 313 F.3d at 1079 (additional citations and internal quotations omitted). The court concluded that the trooper's comment did not create such a coercive environment as to overcome the defendant's will or critically impair his capacity for self-determination. <u>Id.</u>

It is clear then that police coercion is *required* before a statement can be found involuntary; however, the defendant's mental status is considered in deciding *whether* police coercion existed. For example, the <u>Connelly</u> Court stated that

> as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'

Connelly, 479 U.S. at 164 (citation omitted). Thus, the defendant's mental state and ability to resist psychological pressure, as it relates to police coercion, is relevant to the voluntariness inquiry.

In examining the totality of the circumstances surrounding Mr. Klynsma's interview, the relevant inquiry is whether "the facts surrounding this interview demonstrate that the authorities overbore [Mr. Klynsma's] will

and capacity for self-determination." LeBrun, 363 F.3d at 725-26.  To resolve
this question, the court must address two issues:  (1) whether the
circumstances and conditions of the interview itself and/or the conduct of
Agents Boone and Barry rose to the level of police overreaching; and (2)
whether Mr. Klynsma's personal characteristics made him particularly
susceptible to pressure from the agents, so much so that his will and capacity
for self-determination were overborne.

### c.     Application of the Law to Mr. Klynsma's Statements

### i.     Whether Illegal Police Coercion Existed

The court finds the duration and conditions of the interview itself to be
unobjectionable.  The interview lasted approximately one hour, certainly not
the outrageous time frame denounced by the Supreme Court in such cases as
Greenwald, 390 U.S. at 519-21 (defendant, on medication, interrogated for over
18 hours without food or sleep); Davis, 384 U.S. at 739-53 (16 days of
incommunicado interrogation in closed cell without windows, limited food, and
coercive tactics); and Reck, 367 U.S. at 436-44 (defendant held for four days
with inadequate food and medical attention until confession obtained).

The interview occurred in a public parking lot in plain view of any
passersby.  This environment is not inherently police dominated, unlike, for
example, a police station house.  Further, the selection of this location was
done more for convenience purposes than as a means of intimidation–the

agents knew that Mr. Klynsma would be at work and that there were no suitable locations for questioning inside the Sears store or the mall in which the store was located. The fact that the interview took place in plain view of the public strongly suggests that the agents did not use intimidating tactics.

Importantly, the fact that Mr. Klynsma left the interview and exited the agents' vehicle to smoke a cigarette without any objection or restriction from the agents suggests that Mr. Klynsma did not feel intimidated or restrained. Further, Mr. Klynsma obviously understood that his participation in the interview was voluntary, as he was so informed by the agents at least twice. Despite this information, Mr. Klynsma continued to answer questions and converse with the agents, even laughing with them at one point. If Mr. Klynsma had felt pressured to participate in the interview, it seems logical that he would not have been joking with the officers and would have asked at some point to terminate the interview.

The court finds that neither agent engaged in illegal overreaching or coercion in order to elicit statements from Mr. Klynsma. Mr. Klynsma was not physically restrained or abused in any way. Neither agent touched Mr. Klynsma. There is no evidence that either agent verbally abused or bullied Mr. Klynsma. The agents' voices were calm, relaxed, and conversational. There were no firearms visible. Furthermore, only two law enforcement agents conducted the interview. The doors to the vehicle remained unlocked at all

times and Mr. Klynsma sat in the front passenger seat, not the rear of the vehicle.

It is true that Mr. Klynsma claims that he told the agents he did not want to incriminate himself and that the agents responded by yelling "answer the damn question." The court finds it hard to reconcile this version of events with the portion of the interview that was taped. Of course, Mr. Klynsma claims that the demeanor of the agents when the interview was not being taped was different from their demeanor when the interview was being taped. The court rejects this suggestion. Agents Barry and Boone were under the belief that the interview *was* being taped during the first half of the interview. Thus, there was every reason for them to conduct themselves exactly as they testified they did. Furthermore, their testimony about how they conducted themselves is borne out by the portion of the interview that *was* taped. The interview was purely matter-of-fact and cordial.

Even if the exchange that Mr. Klynsma says happened did indeed happen, it does not render the interview coercive nor Mr. Klynsma's statements involuntary. He was told he was free to leave and not under arrest. When he asked to move about, he was allowed to do so freely. He was in fact not arrested on the date of the interview.

Finally, the court sees no evidence of the use of psychologically-coercive interrogation tactics. The court does not find that the agents made promises of leniency to Mr. Klynsma or offered inducements to elicit incriminating

statements.  Mr. Klynsma made incriminating statements immediately after the agents told him the purpose of their investigation.  Although every interrogation of a suspect contains some element of coercion or pressure to elicit a confession, see Astello, 241 F.3d at 967, " 'there is nothing inherently wrong with efforts to create a favorable climate for confession.' " LeBrun, 306 F.3d at 555.  All the evidence submitted at the hearing supports the conclusion that Agents Boone and Barry did not use psychological coercion to elicit statements from Mr. Klynsma.  Mr. Klynsma did become upset, but the testimony from both he and both agents was that the cause of his disturbance was the subject matter being discussed, not any particular attitude or demeanor on the part of the agents.

### ii.    Personal Characteristics of Mr. Klynsma

Mr. Klynsma's mental status is considered in deciding *whether* police coercion existed.  Based on the evidence submitted at the hearing, the court finds no evidence that Mr. Klynsma was overly susceptible to any real or perceived pressure brought to bear by Agents Boone and Barry.  Under the totality of circumstances test, Mr. Klynsma's characteristics are relevant to the extent that the agents knew or should have known of those characteristics and deliberately exploited them.  See Blackburn, 361 U.S. at 207-08; Makes Room For Them, 49 F.3d at 415; Jenner, 982 F.2d at 333.

Although Mr. Klynsma alleges he suffered from "a severe depression and anxiety which was ratcheted up to panic and suicidal ideation requiring

hospitization" [Docket 44], Mr. Klynsma was responsive and cooperative during the interview. He was attentive to details and can be heard on the agents' recording answering questions calmly. He appeared to be mentally sound, capable of understanding the agents' questions and responding appropriately. This fact would suggest that he had the capacity to measure his response and was not "continually pressured." [Docket 44]. Furthermore, his own testimony at the hearing was that, although he became upset during the interview, the cause of his distress was the subject matter being discussed, not the agents' words or actions towards him. In the face of this distress, the agents acted only with solicitude, not exploitation.

In conclusion, Agents Boone and Barry did not take any action to heighten or exacerbate the normal pressures brought to bear upon a suspect during an interrogation. Indeed, the agents promised they would get help for Mr. Klynsma's psychological stress and did so. However, for the sake of argument, even if police coercion did occur, there is simply no evidence that Mr. Klynsma possessed any characteristic or any combination of characteristics that would have made him overly susceptible to coercion at the time. Mr. Klynsma did not exhibit any signs that his will was overborne or his capacity for self-determination critically impaired because of any pressure associated with the interrogation.

In order for Mr. Klynsma's claims to be deemed involuntary, two factors must work in tandem. There must be police coercion or overreaching to the

extent that Mr. Klynsma's will was overborne, and Mr. Klynsma must show signs of susceptibility to having his will overborne. When faced with a factual scenario where only one factor was present, the Eighth Circuit and Supreme Court have consistently held that a defendant's statements were voluntary. For example, in <u>Connelly</u>, the Court found the defendant's confession to be voluntary despite his severe mental illness because there was no evidence of police coercion. <u>Connelly</u>, 479 U.S. 157 (1986). The Eighth Circuit came to the same conclusion in <u>Makes Room for Them</u>, where the defendant had a diminished capacity to resist pressure but there was no police coercion. <u>Makes Room for Them</u>, 49 F.3d 410 (8th Cir. 1995). In Eighth Circuit cases like <u>LeBrun</u> and <u>Astello</u>, the court found the defendants' confessions to be voluntary where, although there was ample evidence of police overreaching, neither defendant had a particularly susceptible nature or sensibility. <u>LeBrun</u>, 363 F.3d 715 (8th Cir. 2004); <u>Astello</u>, 241 F.3d 965 (8th Cir. 2001).

In looking at the totality of the circumstances, the court sees no evidence that Agents Boone and Barry engaged in impermissible police overreaching. Further, Mr. Klynsma displayed no characteristics or signs showing that he was particularly susceptible to any pressures brought to bear by the agents. Without both factors present, the court cannot find that Mr. Klynsma's statements during the interview were involuntary. Thus, the court finds that no violation of the Fifth Amendment occurred, and Mr. Klynsma's statements should not be suppressed.

## CONCLUSION

Based on the evidence adduced at the hearing, the above findings of fact, and the law, the court recommends that Allexander Klynsma's motion to suppress [Docket 42] be denied consistent with the above discussion.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated August 20, 2009

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE